Bill WARIS, Appellant,

v.

John CARNES, et al., County Legislators,

and

John D. Ashcroft, Governor of Missouri, Respondents.

No. WD 40828.

Missouri Court of Appeals, Western District.

Nov. 15, 1988.

Morris & Foust, Max W. Foust, Steven D. Steinhilber, Kansas City, for appellant.

Mark J. Bredemeier, Kansas City, for Legislator respondents.

William L. Webster, Atty. Gen., Curtis F. Thompson, Asst. Atty. Gen., Jefferson City, Missouri, for respondent Governor Ashcroft.

Before LOWENSTEIN, J., Presiding, and TURNAGE and COVINGTON, JJ.

COVINGTON, Judge.

This is an appeal from an entry of judgment in favor of John Carnes, Carol Coe, Fred Arbanas, Roger Cunningham, James D. Tindall, Dennis Waits, Ed Growney, Robert Beaird, and Robert E. Hertzog, Jackson County legislators, and Governor John D. Ashcroft on the petition of Jackson County Executive Bill Waris for declaratory judgment, from judgment in favor of the legislators against the county executive on the legislators' counterclaim for declaratory judgment, and from judgment in favor of the legislators and against John D. Ashcroft on the legislators' cross-claim for declaratory judgment. The judgments are affirmed.

This action arose from a dispute over whether the county executive of Jackson County or the county legislature has the authority to submit to Governor Ashcroft a panel of three names from which to appoint an individual to fill a vacancy on the Jackson County Sports Complex Authority.

Enabling legislation for the Authority was passed in 1965. The Authority was termed "a body corporate and politic and a political subdivision of the state of Missouri." § 64.920, RSMo 1965. The five commissioners of the Authority were to be appointed by the governor from candidates submitted by a majority vote of the county court. § 64.930.4, RSMo 1965.

At the time the Authority was created, Jackson County was operating under a three judge county court form of government. When the Constitutional Home Rule Charter of Jackson County took effect in January of 1973, the county court was replaced by a county executive and a county legislature.

In 1986, the General Assembly amended section 64.930.4 to provide that, in the event of a vacancy, a new panel of three names shall be submitted by a majority vote of the county commission to the governor for appointment. The amendment simply substituted the word "commission" for "court."

From the inception of the Authority until October, 1985, the county legislature submitted panels to the governor when a vacancy on the Authority occurred. On October 14, 1985, Mr. Waris, as county executive, appointed two panels for submission to the governor. The county legislature did not disapprove either panel, and the governor made his selections from those panels.

On November 7, 1986, Mr. Waris issued an executive order nominating three individuals for appointment by the governor to fill a vacancy on the Authority. On January 20, 1987, the county legislature, by unanimous vote, adopted a resolution nominating three other individuals for appoint-

ment to fill the same vacancy. On February 4, 1987, the governor issued a statement indicating that he would not appoint from either panel until the matter was resolved by the courts.

Mr. Waris relies upon section 6.1 of article III of the Jackson County Charter which gives the county executive the power to:

> 1. Appoint, subject to the legislature's power of disapproval, directors of departments, officers not otherwise provided for, members of boards and commissions, and acting officers to fill any vacancy in any appointive or elective office, except that of county legislator; he shall file written notice of such appointment with the clerk of the county legislature.

Mr. Waris contends that the members of the Authority are county officers or, in the alternative, that the Authority is a county board or commission. He further cites section 2 of article XI which provides:

> The legislature shall by ordinance create a county plan commission, a board of zoning adjustment and such other boards and commissions as it may deem necessary. The legislature shall in each case prescribe the number, length of term, and duties and functions of the members of such boards and commissions, and establish duties and procedures for each board and commission. Members of all such boards and commissions shall be appointed by the executive, as provided in this chapter.

According to Mr. Waris, the county executive holds an all-encompassing appointment power.[1]

There are two imperfections in Mr. Waris' argument that the county executive has the power to nominate the panel. First, the sports authority is not a county board, or commission, and its commissioners are not county officers. The Authority is an entity separate from the county, and, as such, the appointment power of the county executive does not apply.

In *State ex rel. Jardon v. Industrial Development Authority*, 570 S.W.2d 666 (Mo.banc 1978), the Missouri Supreme Court examined the question of whether a county industrial development authority created pursuant to chapter 349, RSMo Supp.1977, was a separate and distinct legal entity from the city or county in which it was established. *Id.* at 669. The court noted that the industrial development authority is independent of the local government in its operation, its incurment of debt, and its ownership of property. *Id.* at 672. Although some state control existed over the organization and operation of the authority, the court found the authority to be a "separate entity" where the special purpose authority was established as a "body corporate" and was solely responsible for the issuance of its bonds. *Id.* at 670. The authority was a distinct legal entity established to perform the public purpose designated by the legislature. *Id.* at 672.

Following the reasoning of *Jardon*, the Missouri Supreme Court later found the St. Louis County Port Authority to be a separate entity under Missouri law for purposes of the issuance of, and liability for, its revenue bonds. *State ex rel. Wagner v. St. Louis County Port Auth.*, 604 S.W.2d 592 (Mo.banc 1980). Although the *Wagner* court determined that a port authority was not a political subdivision under article X, section 15 of the Missouri Constitution for the limited purpose of local government tax exemption under article X, section 6, the court nevertheless followed the *Jardon* reasoning and found the local port authority to be a legal entity separate and distinct from both the state and the city or county in which it might be established. *Wagner*, 604 S.W.2d at 604.

The Jackson County Sports Authority is a separate entity within the reasoning of *Jardon* and *Wagner*. Although the Authority is not tax exempt under article X, section 6, it is a separate and distinct legal entity from the county for purposes of its operation, its incurment of debt, and its ownership of property. The Authority's

---

1. The parties have treated the power to nominate as being synonymous with the power to appoint, which is not inappropriate for the purpose of their controversy.

general powers include: the authority to enter into contracts with counties and other political subdivisions, § 64.940.1(3), RSMo 1986; the authority to borrow money and issue bonds, § 64.940.1(6), RSMo 1986; and the authority to condemn any and all rights or property necessary for purposes of the sports authority, § 64.940.1(7), RSMo 1986. The Authority is authorized to exercise additional powers as may be conferred by the general assembly or by act of congress. § 64.940.1(8), RSMo 1986.

The sports authority possesses other indicia of the special entity status. The authority receives funding from neither Jackson County nor the State of Missouri. Its primary source of revenue is derived from rentals from Kansas City's professional football and baseball franchises. The Authority receives funds from the issuance and sale of its own revenue bonds, which are the exclusive obligation of the Authority and are payable from the general funds of the sports authority. § 64.940.1(6)(d), RSMo 1986. The Authority's commissioners and employees are provided with liability insurance by the State of Missouri. Pursuant to section 64.950.2, RSMo 1986, the Authority is required to present an annual report of its operations and transactions to the governor. In 1983 the sports authority was assigned to the State Department of Consumer Affairs, Regulation and Licensing although not included in certain budgetary provisions of the Omnibus State Reorganization Act of 1974. Consequently, the Authority cannot be found to be a county board or commission; rather, it is a separate entity within the meaning of *Jardon* and *Wagner*.

In support of his position that the sports authority commissioners are county officers or members of a county board or commission, the county executive relies upon *State ex inf. Ashcroft ex rel. St. Louis County v. O'Brien*, 610 S.W.2d 638 (Mo.App.1980), claiming that the issue in *O'Brien* is nearly identical to that before the court in the present case. In *O'Brien*, voters of St. Louis County approved a proposition which authorized the county to establish a sheltered workshop pursuant to sections 205.968 to 205.972, RSMo 1969.

*Id.* at 640. The St. Louis County Council enacted an ordinance which created a local sheltered workshop and residence facility. *Id.* A dispute arose over the authority to appoint the sheltered workshop's board of directors. *Id.* The Eastern District of the court of appeals found such directors to be county officers subject to the county supervisor's enumerated county board and commission appointment powers under the St. Louis County Charter, article III, section 3.050(1) which is similar to article III, section 6.1 of the Jackson County Charter. *Id.* at 640–41.

The *O'Brien* case, however, is readily distinguishable from the present case. The county workshop was created by county ordinance, *id.* at 640; the sports authority was created by statute. The sheltered workshop is supported by a local tax levied by the county, *id.* at 641, whereas the sports authority is funded by its own revenues derived from the leasing of property, the borrowing of money, and the issuance of bonds. A county sheltered workshop is a not-for-profit corporation which operates within a political subdivision, the county. *Id.* at 640. The sheltered workshop is not a political subdivision, nor is it a "separate and distinct legal entity" within the meaning of *Jardon* and *Wagner*. Consequently, the reasoning of *O'Brien* does not apply.

The second error in Mr. Waris' contention that the county executive holds an all-encompassing appointment power lies in his representation that the county legislature is without a power to appoint. Mr. Waris concedes that the county legislature has a role in the appointment process; he argues, however, that its role is limited to approving or disapproving appointments by the county executive. He states that the charter's sole reference to appointments by the legislature is contained in section 16 of article II, paragraph 4, which provides that the legislature has the power to disapprove, with enumerated exceptions, the appointment of officers and members of boards or commissions who are appointed by the county executive.

The role of the county legislature in the appointment process, however, goes well

beyond the power contained in article II, section 16, paragraph 4. The charter vests the legislature with broad powers, some clearly legislative and some traditionally nonlegislative. Article II, section 16.1 provides that the county legislature shall have the power to:

Exercise all legislative powers now or hereafter conferred upon counties, county courts, county governing bodies and county officers by the constitution, by law, and by this charter, and to determine and make provision for any matter of county government not otherwise provided for herein, including any matter involved in the transition to the form of government provided by this charter.

Article II, section 16.2 vests in the county legislature the power to "exercise and perform any and all powers of a non-legislative nature which it may possess and any and all other duties which it may need to or be required to perform by the constitution, by law or by this charter."

Finally, article II, section 16.43 authorizes the county legislature to "exercise all powers and duties of counties and county officers as prescribed by law, the exercise of which is not otherwise provided for in this chapter."

Thus, although article III, section 6.1 and article XI, section 2, upon which the county executive grounds his argument, provide the county executive with enumerated powers for appointment of county officers and county board and commission members, article II, sections 16.1 and 16.2, along with section 16.43, vest in the county legislature broad general powers not given to the county executive.[2] The broad general powers given to the county legislature encompass the power to nominate a panel from which the governor fills a vacancy on the sports authority.

The sports authority is an entity separate from the county. As such, it is not a county board or commission and its commissioners are not county officers. The appointment power of the county executive does not apply. The county legislature, in certain contexts, is granted by the charter broad general powers which include the power to nominate and make appointments. Only the county legislature has the authority to submit to Governor Ashcroft a panel of three names from which to appoint an individual to fill a vacancy on the Jackson County Sports Complex Authority.

The judgment of the trial court is affirmed.

All concur.

---

**2.** Article XIII, section 11, authorizes the legislature to resolve conflicts as to the exercise of powers by county offices and officers. Pursuant to this power, although admittedly subsequent to the time during which the present controversy arose, the county legislature passed Ordinance No. 1504 which reads:

BE IT ORDAINED by the County Legislature of Jackson County, Missouri, that the power and duty to submit nominations to the Governor for the appointment of vacancies to the membership of the Jackson County Sports Complex Authority shall be vested in the Jackson County Legislature, thus resolving any and all conflicts with regard to this power and duty.

Ordinance 1504 was vetoed by Mr. Waris and reconsidered and unanimously affirmed by the legislature.